# EXHIBIT A

# COMPENDIUM OF PLAGIARISM[1]

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| [That There is no doubt that] The U.S. Supreme Court has held that non-verbal expression may sometimes be considered "speech" for the purpose of receiving First Amendment protection. As a result, symbols, works of visual and written art, and even physical acts may enjoy the protection of the First Amendment. The question courts ask in such cases is whether the non-verbal expression has sufficient elements of communication. Yet, even when the answer is yes, the Supreme Court has been wary of giving generalized First Amendment protection to *all* non-verbal expression that conveys a message; otherwise, such protection could conceivably legitimize harmful, destructive, or otherwise illegal acts motivated by an expressive purpose. Spray painting graffiti on a street sign, for example, does not receive First Amendment protection even when it conveys a clear and distinct message.<br><br>pp. 2-3, ¶ 5 | The U.S. Supreme Court has held that non-verbal expression may sometimes be considered "speech" for the purpose of receiving First Amendment protection. As a result, symbols, works of visual and written art, and even physical acts may enjoy the protection of the First Amendment. The question courts ask in such cases is whether the non-verbal expression has sufficient elements of communication. Yet, even when the answer is yes, the Supreme Court has been wary of giving generalized First Amendment protection to *all* non-verbal expression that conveys a message; otherwise, such protection could conceivably legitimize harmful, destructive, or otherwise illegal acts motivated by an expressive purpose. Spray painting graffiti on a street sign, for example, does not receive First Amendment protection even when it conveys a clear and distinct message.<br><br>http://www.tjcenter.org/ArtOnTrial/bodyart.html |
| In the 1971 case of *Cohen v. California*, U. S. Supreme Court Justice John Marshall Harlan II succinctly summarized the inherent subjectivity of determining artistic merit when he stated, "one man's vulgarity is another's lyric."<br><br>p. 3, ¶ 5 | In the 1971 case of *Cohen v. California*, U. S. Supreme Court Justice John Marshall Harlan II succinctly summarized the inherent subjectivity of determining artistic merit when he stated, "one man's vulgarity is another's lyric."<br><br>http://www.tjcenter.org/ArtOnTrial/censor.html |
| [The court should first note that C]~~c~~ontrary to the perception of many, the First Amendment does not guarantee the right to express whatever we want, whenever we want. Rather, the | Contrary to the perception of many, the First Amendment does not guarantee the right to express whatever we want, whenever we want. Rather, the Constitution is only a limit on |

---

[1] Counsel for Defendants assembled this chart by performing a simple Google search of the language in Plaintiff's Opposition.  Several of these plagiarized sections were copied from one of numerous potential online sources containing identical language.  Only one source has been selected for ease of reference.  All potential sources, however, predate Plaintiff's Opposition. Typographical errors in the Opposition have not been corrected.  Brackets indicate text added in the Opposition.  Strikethrough indicates text deleted from original source when imported into the Opposition.

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| Constitution is only a limit on *governmental* acts of censorship. The First Amendment simply would not be an issue, for example, if an owner of a strictly private art gallery took down a work because of viewer complaints. Thus, the initial query in any alleged violation of First Amendment rights is whether or not a governmental authority is involved.<br><br>[skipped next paragraph]<br><br>~~The Case:~~  ***Lebron v. National Railroad Passenger Corporation***[.] | *governmental* acts of censorship. The First Amendment simply would not be an issue, for example, if an owner of a strictly private art gallery took down a work because of viewer complaints. Thus, the initial query in any alleged violation of First Amendment rights is whether or not a governmental authority is involved.<br><br>Yet the distinction between a government censor and a private one is not always clear. Many private entities receive governmental support through funding and other means. With such support often comes some degree of governmental oversight or control. Further, government agencies often hire private contractors to perform tasks, including many that were traditionally within the exclusive purview of government personnel. When an artist or any other person is censored by an ostensibly private entity with links to government, courts must evaluate the degree and nature of the governmental nexus to determine if the First Amendment is implicated.<br><br>**The Case:**  ***Lebron v. National Railroad Passenger Corporation*** |
| p. 3, ¶ 6 | http://www.tjcenter.org/ArtOnTrial/censor.html |
| For many people, tattoos have important commemorative or even religious significance. Yet despite this communicative purpose, courts have nonetheless upheld many state imposed restrictions on body art. In these cases (none of which have been heard by the U.S. Supreme Court), the restrictions typically apply to the tattoo artist, not to the person receiving the tattoo. The constitutional relevance of this distinction is outlined in the case ~~summary below.~~~~The Case: [of]~~ ***The State of South Carolina v. Ronald P. White***[.]In 1999, Ronald White, a tattoo artist in Florence, South Carolina, drew a tattoo on a man for a local television news broadcast. The act was the first step by Mr. White in his challenge to a South | For many people, tattoos have important commemorative or even religious significance. Yet despite this communicative purpose, courts have nonetheless upheld many state imposed restrictions on body art. In these cases (none of which have been heard by the U.S. Supreme Court), the restrictions typically apply to the tattoo artist, not to the person receiving the tattoo. The constitutional relevance of this distinction is outlined in the case summary below.<br><br>**The Case:**  ***The State of South Carolina v. Ronald P. White***<br>In 1999, Ronald White, a tattoo artist in Florence, South Carolina, drew a tattoo on a |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| Carolina law that prohibited tattooing except by a licensed physician for cosmetic or reconstructive purposes. Oklahoma is the only other state with such a statute. After the news broadcast, Mr. White was arrested, fined $2,500 and put on five years' probation for violating the state's anti-tattoo law.  [skipped sentence]  Mr. White appealed his conviction to the South Carolina Supreme Court, arguing that the statute's outright ban of tattooing violated his First Amendment right to freedom of speech. The state court affirmed the conviction, holding that the *process* of getting a tattoo, as opposed to the tattoo itself, was not sufficiently communicative to be considered "speech." | man for a local television news broadcast. The act was the first step by Mr. White in his challenge to a South Carolina law that prohibited tattooing except by a licensed physician for cosmetic or reconstructive purposes. Oklahoma is the only other state with such a statute. After the news broadcast, Mr. White was arrested, fined $2,500 and put on five years' probation for violating the state's anti-tattoo law. The trial court did not hear any expert medical testimony regarding the health risks of tattooing, instead relying on White's own concession that, if completely unregulated, tattooing could present a public health risk. Mr. White appealed his conviction to the South Carolina Supreme Court, arguing that the statute's outright ban of tattooing violated his First Amendment right to freedom of speech. The state court affirmed the conviction, holding that the *process* of getting a tattoo, as opposed to the tattoo itself, was not sufficiently communicative to be considered "speech." |
| pp. 3-4, ¶ 7 | http://www.tjcenter.org/ArtOnTrial/bodyart.html |
| Art is intended to be evocative. But if a work of art evokes a violent or otherwise illegal response, should the artist be held responsible for the actions of his or her audience? Is this what Justice Oliver Wendall Holmes, Jr. had in mind when he stated, "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic"? In the case of *Brandenburg v. Ohio*, the U. S. Supreme Court held that expression advocating violent or otherwise illegal behavior only loses First Amendment protection if the expression is *directed* to inciting or producing *imminent* lawless behavior, and is *likely* to result in such action. | Art is intended to be evocative. But if a work of art evokes a violent or otherwise illegal response, should the artist be held responsible for the actions of his or her audience? Is this what Justice Oliver Wendall Holmes, Jr. had in mind when he stated, "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic"?<br><br>In the case of *Brandenburg v. Ohio*, the U. S. Supreme Court held that expression advocating violent or otherwise illegal behavior only loses First Amendment protection if the expression is *directed* to inciting or producing *imminent* lawless behavior, and is *likely* to result in such action. |
| p. 4, ¶ 8 | http://www.tjcenter.org/ArtOnTrial/ozzy.html |
| The threshold of consciousness is the dividing | The threshold of consciousness is the dividing |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| line between something that can be processed by the conscious mind and something that enters the subconscious mind without any such processing. A ~~subliminal~~ [hidden] message is not intense enough to produce a sensation but has sufficient intensity to influence the behavior and mental processes of one's mind. [skipped three sentences]  The decisions the conscious mind makes are based upon the knowledge and reasoning skills one has developed through experience and education. The subconscious mind does not have these reasoning skills, and thus has no ability to distinguish right from wrong, or judge the information it receives. When a suggestion enters the subconscious mind, it is taken as the truth and stored for future reference. For this reason, the strength of subliminal messages has virtually no boundaries, and can be dangerous when used improperly. | line between something that can be processed by the conscious mind and something that enters the subconscious mind without any such processing. A subliminal message is not intense enough to produce a sensation but has sufficient intensity to influence the behavior and mental processes of one's mind. There are many ways in which a suggestion can be delivered to the audience, and you will see some such methods discussed in the <u>advertising</u> section of this site. When an individual is told to do something, he or she generally thinks about the positive and negative consequences, and then decides whether or not it is a good idea. This is done in the conscious mind, where the individual is aware of the suggestion he or she is being given. The decisions the conscious mind makes are based upon the knowledge and reasoning skills one has developed through experience and education. The subconscious mind does not have these reasoning skills, and thus has no ability to distinguish right from wrong, or judge the information it receives. When a suggestion enters the subconscious mind, it is taken as the truth and stored for future reference. For this reason, the strength of subliminal messages has virtually no boundaries, and can be dangerous when used improperly. |
| p. 4, ¶ 9 | http://library.thinkquest.org/28162/legal.html |
| A federal judge[, recently,] ~~on Tuesday~~ denied a motion from Electronic Arts and the National Collegiate Athletic Assn. to dismiss a lawsuit by Keller. The former NCAA athlete stirred up controversy when he filed his lawsuit ~~last~~ May[, 2009] against EA and the NCAA, alleging that the two profited from the likenesses of college athletes without compensating them.<br><br>[skipped next two paragraphs]<br><br>The judge for the U.S. Federal Court in the Northern District of California, Claudia Wilken, disagreed with [defendants] ~~their~~ reasoning, for | A federal judge on Tuesday denied a motion from Electronic Arts and the National Collegiate Athletic Assn. to dismiss a lawsuit by Keller. The former NCAA athlete stirred up controversy when he filed his lawsuit last May against EA and the NCAA, alleging that the two profited from the likenesses of college athletes without compensating them.<br><br>At stake is a multibillion-dollar video game franchise for the Redwood City, Calif., game company. EA has licenses with the NCAA to create such titles as NCAA Football 10 and NCAA Basketball 10. |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| the most part. [Keller v. Electronic Arts (2010 U.S. Dist. LEXIS 10719, 38 Media L. Rep. 1353 (N.D. Cal. Feb. 8, 2010).]<br><br><br><br><br><br>p. 5, ¶ 10 | Not surprisingly, the NCAA and EA promptly filed a motion to throw out Keller's suit.<br><br>The judge for the U.S. Federal Court in the Northern District of California, Claudia Wilken, disagreed with their reasoning, for the most part.<br><br>http://latimesblogs.latimes.com/entertainmentnewsbuzz/2010/02/judge-denies-ea-ncaa-claim-to-dismiss-lawsuit-.html (article by Alex Pham) |
| All states, whether they have statutory or common law schemes, protect the name and likeness of an individual[.]<br><br>p. 5, ¶ 11 | All states, whether they have statutory or common law schemes, protect the name and likeness of an individual<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt (at slide 45). |
| [In] *Carson v. Here's Johnny Portable Toilers, Inc., 698 F.2d 831*[,]<br><br>[skipped first two bullet points]<br><br>T[t]he court held "if the celebrity's identity is commercially exploited, there has been an invasion of the right whether his name or likeness is used."<br><br><br><br><br><br><br><br><br><br>p. 5, ¶ 11 | Carson v. Here's Johnny Portable Toilers, Inc., 698 F.2d 831<br>• Recognized that a catchphrase was an identifiable attribute considered part of celebrity's right of publicity<br>• The phrases "Here's Johnny" and "World's Foremost Commodian" used for portable toilets held to violate the right of publicity of Johnny Carson because the slogans were considered an integral part of Carson's identity<br>• The court held "if the celebrity's identity is commercially exploited, there has been an invasion of the right whether his name or likeness is used."<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 46 |
| [In] *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996)[,]<br><br>[skipped first two bullet points]<br><br>T[t]he court held that a name is an integral part of one's identity, and it cannot be "abandoned," despite a failure to use it[.] | Abdul-Jabbar v. General Motors Corp., 85 F.3d 407 (9th Cir. 1996)<br>• GM used Jabbar's birth name, Lew Alcindor, in a car advertisement without his permission<br>• When Jabbar brought an action for false endorsement, GM contended that he "abandoned" his rights to his birth name once he adopted his Islamic name |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| | • The court held that a name is an integral part of one's identity, and it cannot be "abandoned," despite a failure to use it<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 47 |
| p. 5, ¶ 12 | |
| *Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985)*[, deals with]~~The~~ use of a celebrity look-alike can violate a celebrity's right of publicity[.]National Video created an ad campaign around a Woody Allen look-alike who was depicted as visiting its video stores[.] Despite the existence of a disclaimer in the ad, the court held that National Video violated the Lanham Act because there was a strong likelihood of consumer confusion regarding whether Allen actually endorsed National Video[.] | Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985)<br>• The use of a celebrity look-alike can violate a celebrity's right of publicity<br>• National Video created an ad campaign around a Woody Allen look-alike who was depicted as visiting its video stores<br>• Despite the existence of a disclaimer in the ad, the court held that National Video violated the Lanham Act because there was a strong likelihood of consumer confusion regarding whether Allen actually endorsed National Video |
| p. 5, ¶ 12 | www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 48 |
| [In] *Ali v. Playgirl*, 447 F.Supp. 723 (D.C.N.Y. 1978)[,]<br>~~T~~[t]he former heavyweight[-]boxing champ brought suit for injunctive relief and damages resulting from publication of magazine containing caricatured depiction of an African-American man seated in the corner of a boxing ring, sans boxing trunks[.]  The court held for Ali, ruling that under New York law, the definition of "portrait" in a tort action for appropriation of likeness is not limited to actual photos[.] | Ali v. Playgirl, 447 F.Supp. 723 (D.C.N.Y. 1978)<br>• The former heavyweight boxing champ brought suit for injunctive relief and damages resulting from publication of magazine containing caricatured depiction of an African-American man seated in the corner of a boxing ring, sans boxing trunks<br>• The court held for Ali, ruling that under New York law, the definition of "portrait" in a tort action for appropriation of likeness is not limited to actual photos |
| pp. 5-6, ¶ 13 | http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 18 |
| [In] *Hoffman v. Capital Cities, Inc.*, 33 F.Supp.2d 867(C.D.Cal. 1999)[,]Defendant digitally altered a photograph appearing originally on a poster for the movie 'Tootsie' to show Hoffman in a silk gown by Richard Tyler, | Hoffman v. Capital Cities, Inc., 33 F.Supp.2d 867<br>(C.D.Cal. 1999)<br><br>• Defendant digitally altered a photograph |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| with matching high heel shoes by Ralph Lauren.Hoffman sued under state common and statutory law and the Lanham Act[.]The court rejected the defendant's First Amendment and newsworthiness defenses because they did not apply to knowingly false speech[.]The court held that Hoffman suffered actual damage to his property right by not being able to reap the commercial benefit of his own personality[.]<br><br><br>p. 6, ¶ 14 | appearing originally on a poster for the movie 'Tootsie' to show Hoffman in a silk gown by Richard Tyler, with matching high heel shoes by Ralph Lauren<br><br>• Hoffman sued under state common and statutory law and the Lanham Act<br>• The court rejected the defendant's First Amendment and newsworthiness defenses because they did not apply to knowingly false speech<br>• The court held that Hoffman suffered actual damage to his property right by not being able to reap the commercial benefit of his own personality<br><br>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 19 |
| [In] *Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988)[,]Ford Motor, after unsuccessfully seeking the services of Bette Midler for a car commercial, hired one of her backup singers to imitate her voice singing "Do You Want to Dance"[.]The court did not go so far as to hold that every imitation of a voice in an ad is actionable, but held "when a distinctive voice of a professional singer is widely known and is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California."<br><br><br>p. 6, ¶ 15 | Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir. 1988)<br>• Ford Motor, after unsuccessfully seeking the services of Bette Midler for a car commercial, hired one of her backup singers to imitate her voice singing "Do You Want to Dance"<br>• The court did not go so far as to hold that every imitation of a voice in an ad is actionable, but held "when a distinctive voice of a professional singer is widely known and is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California."<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 49 |
| [In] *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992)[,] I[i]n a fact pattern similar to Midler, Frito Lay hired a Tom Waits sound-alike to sing in a Doritos commercial[.]Waits brought and won claims both for voice misappropriation under the common law right of publicity and false endorsement under the Lanham Act § 43(a)[.] | Waits v. Frito-Lay, Inc., 978 F.2d 1093 (9th Cir. 1992)<br>• In a fact pattern similar to Midler, Frito Lay hired a Tom Waits sound-alike to sing in a Doritos commercial<br>• Waits brought and won claims both for voice misappropriation under the common law right of publicity and false |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| | endorsement under the Lanham Act § 43(a) |
| p. 6, ¶ 16 | www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 50 |
| [In] *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395 (9th Cir. 1992)[,]Samsung used a robot dressed in a blond wig, evening gown, and jewelry posed in front of a game board similar to that of "Wheel of Fortune"[.]White sued under state common and statutory right of publicity and the Lanham Act[.]The court found for White, holding that Samsung had no right to invoke White's identity in the public's minds without her permission[.] | White v. Samsung Electronics America, Inc., 971 F.2d 1395 (9th Cir. 1992)<br>• Samsung used a robot dressed in a blond wig, evening gown, and jewelry posed in front of a game board similar to that of "Wheel of Fortune"<br>• White sued under state common and statutory right of publicity and the Lanham Act<br>• The court found for White, holding that Samsung had no right to *invoke White's identity in the public's minds* without her permission |
| pp. 6-7, ¶17 | www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 51 |
| [In] *The Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135 (1982)[,][p]Plaintiff sought an injunction prohibiting defendant from selling small sculptures of Martin Luther King, Jr. without its permission[.]Defendant argued that King's right of publicity ended at his death[.] The court held that the right of publicity survives the death of its owner, and is inheritable and devisable[.] Driving this decision was the court's desire to prevent free riders from benefiting from a celebrity's untimely death[.] | The Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc., 250 Ga. 135 (1982)<br>• Plaintiff sought an injunction prohibiting defendant from selling small sculptures of Martin Luther King, Jr. without its permission<br>• Defendant argued that King's right of publicity ended at his death<br>• The court held that the right of publicity survives the death of its owner, and is inheritable and devisable<br>• Driving this decision was the court's desire to prevent free riders from benefiting from a celebrity's untimely death |
| p. 7, ¶ 18 | http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 24 |
| [In] *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977)[,]Zacchini refused to give a news reporter permission to tape his human cannonball act[.]  The reporter taped all | Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977)<br>• Zacchini refused to give a news reporter permission to tape his human cannonball |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| 15 seconds of Zacchini's act and it was broadcast on the evening news[.]  Zacchini sued, claiming misappropriation of his professional property[.]  The court held that the newsworthiness exception to the right of publicity did not apply because showing the entire act undermined Zacchini's ability to make a living[.]<br><br>p. 7, ¶ 19 | act<br>• The reporter taped all 15 seconds of Zacchini's act and it was broadcast on the evening news<br>• Zacchini sued, claiming misappropriation of his professional property<br>• The court held that the newsworthiness exception to the right of publicity did not apply because showing the entire act undermined Zacchini's ability to make a living<br><br>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 26 |
| Without ever seeking, much less obtaining, [Woody] Allen's permission or consent, American Apparel disseminated billboard and Internet advertisements containing Mr. Allen's image and prominently displayed said images on billboards in the Cities of New York and Los Angeles, California, as well as on American Apparel's Internet website.Allen sued American Apparel in the Southern District of New York for violation of his right of publicity under New York's Civil Rights Law § 51 and § 43(a) of 15 U.S.C. § 1125(a), the Lanham Act. Allen alleged that American Apparel by its President and Chief Executive Officer, Dov Charney, knowingly used the image, likeness of Plaintiff Woody Allen for trade and advertising purposes without Mr. Allen's consent.<br><br>[The] c~~C~~ase [got] settled on the eve of trial, recently.<br><br>p. 7, ¶ 20 | Without ever seeking, much less obtaining, Allen's permission or consent, American Apparel disseminated billboard and Internet advertisements containing Mr. Allen's image and prominently displayed said images on billboards in the Cities of New York and Los Angeles, California, as well as on American Apparel's Internet website.<br><br>Allen sued American Apparel in the Southern District of New York for violation of his right of publicity under New York's Civil Rights Law § 51 and § 43(a) of 15 U.S.C. § 1125(a), the Lanham Act.<br><br>Allen alleged that American Apparel by its President and Chief Executive Officer, Dov Charney, knowingly used the image, likeness of Plaintiff Woody Allen for trade and advertising purposes without Mr. Allen's consent.<br><br>Case settled on the eve of trial for $5 Million, which is the highest amount ever recorded for a right of publicity action.<br><br>www.loeb.com/.../Right%20of%20Publicity%20Webinar.pdf, at slide 18, posted April 1, 2010 |
| ~~In support of its sweeping holding, the majority relies in part upon~~ *Pirone v. MacMillan, Inc.,* | In support of its sweeping holding, the majority relies in part upon *Pirone v. MacMillan, Inc.,* |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| 894 F.2d 579)2d Cir. 1990);however, a close reading of Pirone does not support the majority's position but instead follows the long line of cases establishing that a Court stated that plaintiff may succeed on a claim under §1125(a) for infringement of the unregistered mark of his likeness or image by bringing forth evidence of consumer confusion. To illustrate, in Pirone the estate of the famous baseball player Babe Ruth brought suit against the manufacturer of a pocket calender bearing the photograph of Babe Ruth, among other famous baseball players, claiming trademark infringement under §32 (registered mark) and § 43(a) (unregistered mark). See id. at 582. In discussing the plaintiff's claims made under § 43(a),the Second Circuit noted that claims under §43(a) are broader than those made under §32, inasmuch as they cover a broader array of violations. *Id.* The court went on to state thatthe crucial determinant in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question. In order to be confused, a consumer need not believe that the Ruth estate actually produced the calender. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.<br><br>p. 8, ¶ 21 | 894 F.2d 579 (2d Cir. 1990); however, a close reading of *Pirone* does not support the majority's position but instead follows the long line of cases establishing that a plaintiff may succeed on a claim under § 1125(a) for infringement of the unregistered mark of his likeness or image by bringing forth evidence of consumer confusion. To illustrate, in *Pirone* the estate of the famous baseball player Babe Ruth brought suit against the manufacturer of a pocket calender bearing the photograph of Babe Ruth, among other famous baseball players, claiming trademark infringement under § 32 (registered mark) and § 43(a) (unregistered mark). *See id.* at 582. In discussing the plaintiff's claims made under § 43(a), the Second Circuit noted that claims under § 43(a) are broader than those made under § 32, inasmuch as they cover a broader array of violations. *Id.* The court went on to state that<br><br>the crucial determinant in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question. In order to be confused, a consumer need not believe that the Ruth estate actually produced the calender. *The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.*<br><br>*ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 940-941 (6th Cir. 2003). |
| Section 43(a) of the Lanham Act prohibits false endorsements[.]Section 43(a) protects individuals againstoOutright theft of identity (such as using a photograph of a celebrity without permission)[and] uUnauthorized imitations. | • Section 43(a) of the Lanham Act prohibits false endorsements<br>• Section 43(a) protects individuals against<br>  • Outright theft of identity (such as using a photograph of a celebrity without permission) |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| | • Unauthorized imitations |
| p. 8, ¶ 22 | www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 42 |
| The phrase "right of publicity" was coined by Judge Jerome Frank in Haelean Laboratories, Inc. v. Topps Chewing Gum, Inc. 202 F.2d 866 (2nd Cir. 1953). Following New York law, Judge Frank delineated the distinction between the "right of publicity" and the "right of privacy." New York's publicity law enabled individuals to protect themselves from unauthorized commercial appropriation of their personas. Judge Frank thereby recognized an independent common law right protecting economic interests rather than the personal, emotional interests associated with the right of privacy. | The phrase "right of publicity" was coined by Judge Jerome Frank in Haelean Laboratories, Inc. v. Topps Chewing Gum, Inc. 202 F.2d 866 (2nd Cir. 1953). Following New York law, Judge Frank delineated the distinction between the "right of publicity" and the "right of privacy." New York's publicity law enabled individuals to protect themselves from unauthorized commercial appropriation of their personas. Judge Frank thereby recognized an independent common law right protecting economic interests rather than the personal, emotional interests associated with the right of privacy. |
| pp. 8-9, ¶ 23 | http://www.markroesler.com/legal/rights.html |
| Unlike the right of privacy, which is a personal right, the right of publicity is generally regarded as a property right. While damages in privacy cases are measured by emotional distress, damages in publicity cases are measured by the commercial injury to the business value of personal identity. J. Thomas McCarthy says, "[p]rivacy rights are personal rights. Damage is to human dignity." From The Spring 1995 Horace S. Manges Lecture, The Human Persona as Commercial Property; The Right of Publicity, March 9, 1995, Columbia University School of Law, at 134. McCarthy continues: "The right of publicity is not . . . just another kind of privacy right. It . . . is a wholly different and separate legal right." 19 COLUM.-VLA J.L. & ARTS 129. Infringement damages are therefore determined by the fair market value of the plaintiff's identity, the infringer's profits, and damage to the licensing opportunities for the plaintiff's identity | Unlike the right of privacy, which is a personal right, the right of publicity is generally regarded as a property right. While damages in privacy cases are measured by emotional distress, damages in publicity cases are measured by the commercial injury to the business value of personal identity. J. Thomas McCarthy says, "[p]rivacy rights are personal rights. Damage is to human dignity." From The Spring 1995 Horace S. Manges Lecture, The Human Persona as Commercial Property; The Right of Publicity, March 9, 1995, Columbia University School of Law, at 134. McCarthy continues: "The right of publicity is not . . . just another kind of privacy right. It . . . is a wholly different and separate legal right." 19 COLUM.-VLA J.L. & ARTS 129. Infringement damages are therefore determined by the fair market value of the plaintiff's identity, the infringer's profits, and damage to the licensing opportunities for the plaintiff's identity. |
| p. 9, ¶ 24 | http://www.markroesler.com/legal/rights.html |
| Dean William Prosser's article "Privacy" 48 | • Dean William Prosser's article "Privacy" |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| Cal.L.Rev. 383 (1960) expanded and refined the concept of right to privacy, identifying ~~four distinct torts:~~[the tort of]<br><br>[skips two bullet points]<br><br>[']Appropriation of an individual's name or likeness of personal gain['.]<br><br><br>p. 9, ¶25 | 48 Cal.L.Rev. 383 (1960) expanded and refined the concept of right to privacy, identifying four distinct torts:<br>&#10148; Intrusion upon the seclusion or solitude of an individual<br>&#10148; Public exposure of private facts<br>&#10148; Disclosures that place the individual in a "false light" in the public eye<br>&#10148; Appropriation of an individual's name or likeness of personal gain<br><br>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 3 |
| ~~Baila Celedonia, in her article Recent Developments in the Right of Publicity in the United States, 177 suggested that "the [greater Therefore, the]~~ ability and the extent to which a celebrity can control the use of his or her [of] "persona" in a commercial context, the greater is the potential economic reward of his or her fame."<br><br><br><br>p. 10, ¶ 27 | Baila Celedonia, in her article Recent Developments in the Right of Publicity in the United States, 177 suggested that "the [greater the] ability and the extent to which a celebrity can control the use of his or her 'persona' in a commercial context, the greater is the potential economic reward of his or her fame."<br><br>Quiming, Gary P., Comment: Playing by the Rules of Intellectual Property: Fantasy Baseball's Fight to Use Major League Baseball Players' Names and Statistics, 29 Hawaii L. Rev. 301, 318 (2006). |
| [Most of the] ~~All~~ states, whether they have statutory or common[-]law schemes, protect the name and likeness of an individual[.]<br><br><br>p. 10, ¶ 28 | All states, whether they have statutory or common law schemes, protect the name and likeness of an individual<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 45 |
| To meet the ingenuity of advertisers and others eager to benefit from the aura of celebrity, courts have expanded what is considered to be a name or likeness[.]<br><br><br>p. 10, ¶ 28 | To meet the ingenuity of advertisers and others eager to benefit from the aura of celebrity, courts have expanded what is considered to be a name or likeness<br><br>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 14 |
| The law has continued to expand the breadth of the aspects of persona which are protected from unlicensed commercial exploitation, thus increasing the economic value of a celebrity | The law has continued to expand the breadth of the aspects of persona which are protected from unlicensed commercial exploitation, thus increasing the economic value of a celebrity |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| persona. The law has long protected from exploitation the use of another's name and "likeness". To meet the ingenuity of advertisers and others eager to benefit from the aura of a celebrity, the courts have expanded what is considered the use of a name[2]~~**=3**~~ or likeness [3].~~**=4**~~<br><br>p. 10, ¶ 29 | persona. The law has long protected from exploitation the use of another's name and "likeness". To meet the ingenuity of advertisers and others eager to benefit from the aura of a celebrity, the courts have expanded what is considered the use of a name**=3** or likeness.**=4**<br><br>http://www.radioparadise.com/rp_2.php#name=Forum&file=showtopic&topic_id=8209, posted Sept. 18, 2006 |
| Even where a full name is not used, liability has been found if the plaintiff is identifiable from the use. *Carson v. Here's Johnny Portable Toilets, Inc*., 698 F.2d 831 (6th Cir. 1983)[.]<br><br>p. 10, n. 2 | Even where a full name is not used, liability has been found if the plaintiff is identifiable from the use. Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831 (6th Cir. 1983) (phrases "Here's Johnny" and "The World's Foremost Commodian" used for portable toilets were held to violate the right of publicity of comedian Johnny Carson);<br><br>http://www.radioparadise.com/rp_2.php#name=Forum&file=showtopic&topic_id=8209, posted Sept. 18, 2006 |
| ~~Carson v. Here's Johnny Portable Toilers, Inc., 698 F.2d 831~~[The court] ~~R~~recognized that a catchphrase was an identifiable attribute considered part of celebrity's right of publicity[.]The phrases "Here's Johnny" and "World's Foremost ~~Commodian~~[Comedian]" used for portable toilets held to violate the right of publicity of Johnny Carson because the slogans were considered an integral part of Carson's identity[.]The court held "if the celebrity's identity is commercially exploited, there has been an invasion of the right whether his name or likeness is used."<br><br>p. 10, n. 2 | Carson v. Here's Johnny Portable Toilers, Inc., 698 F.2d 831<br>• Recognized that a catchphrase was an identifiable attribute considered part of celebrity's right of publicity<br>• The phrases "Here's Johnny" and "World's Foremost Commodian" used for portable toilets held to violate the right of publicity of Johnny Carson because the slogans were considered an integral part of Carson's identity<br>• The court held "if the celebrity's identity is commercially exploited, there has been an invasion of the right whether his name or likeness is used."<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 46 |
| *Hirsch v. S.C. Johnson & Sons, Inc*., 205 U.S.P.Q. 920 (1979) (nickname "Crazylegs" used in connection with defendant's shaving gel | Hirsch v. S.C. Johnson & Sons, Inc., 205 U.S.P.Q. 920 (1979) (nickname "Crazylegs" used in connection with defendant's shaving gel |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| identified the football player Elroy Hirsch).<br><br><br>p. 10, n. 2 | identified the football player Elroy Hirsch).<br><br>http://www.radioparadise.com/rp_2.php#name=Forum&file=showtopic&topic_id=8209, posted Sept. 18, 2006 |
| *Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985)*[, deals with]~~The~~ use of a celebrity look-alike can violate a celebrity's right of publicity.National Video created an ad campaign around a Woody Allen look-alike who was depicted as visiting its video tores[.] Despite the existence of a disclaimer in the ad, the court held that National Video violated the Lanham Act because there was a strong likelihood of consumer confusion regarding whether Allen actually endorsed National Video[.]<br><br><br>p. 11, ¶ 30 | Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985)<br><ul><li>The use of a celebrity look-alike can violate a celebrity's right of publicity</li><li>National Video created an ad campaign around a Woody Allen look-alike who was depicted as visiting its video stores</li><li>Despite the existence of a disclaimer in the ad, the court held that National Video violated the Lanham Act because there was a strong likelihood of consumer confusion regarding whether Allen actually endorsed National Video</li></ul>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 48 |
| [In] *Ali v. Playgirl*, 447 F.Supp. 723 (D.C.N.Y. 1978)[,]<br>~~T~~The former heavyweight[-]boxing champ brought suit for injunctive relief and damages resulting from publication of magazine containing caricatured depiction of an African-American man seated in the corner of a boxing ring, sans boxing trunks[.] The court held for Ali, ruling that under New York law, the definition of "portrait" in a tort action for appropriation of likeness is not limited to actual photos[.]The court held that the nude photo was merely used to attract attention for the purpose of trade, so the defendant could not use the defense that it used the photo in connection with reporting the news or a newsworthy event[.]<br><br><br>p. 11, ¶ 31 | Ali v. Playgirl, 447 F.Supp. 723 (D.C.N.Y. 1978)<br><ul><li>The former heavyweight boxing champ brought suit for injunctive relief and damages resulting from publication of magazine containing caricatured depiction of an African-American man seated in the corner of a boxing ring, sans boxing trunks</li><li>The court held for Ali, ruling that under New York law, the definition of "portrait" in a tort action for appropriation of likeness is not limited to actual photos</li><li>The court held that the nude photo was merely used to attract attention for the purpose of trade, so the defendant could not use the defense that it used the photo in connection with reporting the news or a newsworthy event</li></ul>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 18 |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| [In] *Hoffman v. Capital Cities, Inc.*, 33 F.Supp.2d 867(C.D.Cal. 1999)[,]Defendant digitally altered a photograph appearing originally on a poster for the movie 'Tootsie' to show Hoffman in a silk gown by Richard Tyler, with matching high heel shoes by Ralph Lauren[.]Hoffman sued under state common and statutory law and the Lanham Act[.]The court rejected the defendant's First Amendment and newsworthiness defenses because they did not apply to knowingly false speech[.]The court held that Hoffman suffered actual damage to his property right by not being able to reap the commercial benefit of his own personality[.]<br><br>pp. 11-12, ¶ 32 | Hoffman v. Capital Cities, Inc., 33 F.Supp.2d 867 (C.D.Cal. 1999)<br><br>• Defendant digitally altered a photograph appearing originally on a poster for the movie 'Tootsie' to show Hoffman in a silk gown by Richard Tyler, with matching high heel shoes by Ralph Lauren<br>• Hoffman sued under state common and statutory law and the Lanham Act<br>• The court rejected the defendant's First Amendment and newsworthiness defenses because they did not apply to knowingly false speech<br>• The court held that Hoffman suffered actual damage to his property right by not being able to reap the commercial benefit of his own personality<br><br>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 19 |
| A federal judge[, recently,] ~~on Tuesday~~ denied a motion from Electronic Arts and the National Collegiate Athletic Assn. to dismiss a lawsuit by Keller. The former NCAA athlete stirred up controversy when he filed his lawsuit ~~last~~ May[, 2009] against EA and the NCAA, alleging that the two profited from the likenesses of college athletes without compensating them.<br><br>[skipped next two paragraphs]<br><br>The judge for the U.S. Federal Court in the Northern District of California, Claudia Wilken, disagreed with [defendants] ~~their~~ reasoning, for the most part. [Keller v. Electronic Arts (2010 U.S. Dist. LEXIS 10719, 38 Media L. Rep. 1353 (N.D. Cal. Feb. 8, 2010).] | A federal judge on Tuesday denied a motion from Electronic Arts and the National Collegiate Athletic Assn. to dismiss a lawsuit by Keller. The former NCAA athlete stirred up controversy when he filed his lawsuit last May against EA and the NCAA, alleging that the two profited from the likenesses of college athletes without compensating them.<br><br>At stake is a multibillion-dollar video game franchise for the Redwood City, Calif., game company. EA has licenses with the NCAA to create such titles as NCAA Football 10 and NCAA Basketball 10.<br><br>Not surprisingly, the NCAA and EA promptly filed a motion to throw out Keller's suit.<br><br>The judge for the U.S. Federal Court in the Northern District of California, Claudia Wilken, disagreed with their reasoning, for the most part. |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| p. 12, ¶ 33 | http://latimesblogs.latimes.com/entertainmentnewsbuzz/2010/02/judge-denies-ea-ncaa-claim-to-dismiss-lawsuit-.html, article by Alex Pham |
| Without ever seeking, much less obtaining, [Woody] Allen's permission or consent, American Apparel disseminated billboard and Internet advertisements containing Mr. Allen's image and prominently displayed said images on billboards in the Cities of New York and Los Angeles, California, as well as on American Apparel's Internet website.Allen sued American Apparel in the Southern District of New York for violation of his right of publicity under New York's Civil Rights Law § 51 and § 43(a) of 15 U.S.C. § 1125(a), the Lanham Act. Allen alleged that American Apparel by its President and Chief Executive Officer, Dov Charney, knowingly used the image, likeness of Plaintiff Woody Allen for trade and advertising purposes without Mr. Allen's consent.<br><br>[The] cCase [got] settled on the eve of trial, recently. | Without ever seeking, much less obtaining, Allen's permission or consent, American Apparel disseminated billboard and Internet advertisements containing Mr. Allen's image and prominently displayed said images on billboards in the Cities of New York and Los Angeles, California, as well as on American Apparel's Internet website.<br><br>Allen sued American Apparel in the Southern District of New York for violation of his right of publicity under New York's Civil Rights Law § 51 and § 43(a) of 15 U.S.C. § 1125(a), the Lanham Act.<br><br>Allen alleged that American Apparel by its President and Chief Executive Officer, Dov Charney, knowingly used the image, likeness of Plaintiff Woody Allen for trade and advertising purposes without Mr. Allen's consent.<br><br>Case settled on the eve of trial for $5 Million, which is the highest amount ever recorded for a right of publicity action.<br><br>www.loeb.com/.../Right%20of%20Publicity%20Webinar.pdf, at slide 18, posted April 1, 2010 |
| p. 12, ¶ 34 | |
| The key to liability is a finding [by the court] that the individual's voice is distinctive and well-known [identifiable by the public with the celebrity.] | The key to liability is a finding that the individual's voice is distinctive and well-known<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 50 |
| pp. 12-13, ¶ 35 | |
| Over one hundred years ago, Samuel D. Warren and Louis D. Brandeis wrote a law review article in favor of a right to privacy[,] [(]Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193: 1890). After the New York Court of Appeals refused to recognize such right under the common law, *Robertson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 | Over one hundred years ago, Samuel D. Warren and Louis D. Brandeis wrote a law review article in favor of a right to privacy (Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193: 1890). After the New York Court of Appeals refused to recognize such right under the common law, Robertson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442 |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| (1902) (unauthorized use of a young woman's photograph in advertisements for bags of flour), the New York State legislature enacted a statute in 1903 which prohibits use of a person's name, portrait or picture for advertising purposes or purpose of trade without the person's written consent (N.Y. C … That substantially remains the law in NewYork State to this day.<br><br>p. 13, n. 4 | (1902) (unauthorized use of a young woman's photograph in advertisements for bags of flour), the New York State legislature enacted a statute in 1903 which prohibits use of a person's name, portrait or picture for advertising purposes or purpose of trade without the person's written consent (N.Y. C<br><br>…<br><br>That substantially remains the law in NewYork State to this day.<br><br>http://www.research-assistance.com/paper/26173/a_ra_default/ernest_hemingway__trademark_law.html |
| In a case of apparent first impression in New York state courts, a Manhattan judge has ruled that a right-to-privacy lawsuit initiated by actor Jerry Orbach against Hilton Hotels may continue, Orbach's death notwithstanding.<br><br>p. 14, ¶ 41 | In a case of apparent first impression in New York state courts, a Manhattan judge has ruled that a right-to-privacy lawsuit initiated by actor Jerry Orbach against Hilton Hotels may continue, Orbach's death notwithstanding.<br><br>http://www.law.com/jsp/article.jsp?id=900005544588&slreturn=1, July 25, 2005 article |
| [In] *The Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135 (1982)[,]p Plaintiff sought an injunction prohibiting defendant from selling small sculptures of Martin Luther King, Jr. without its permission[.]Defendant argued that King's right of publicity ended at his death[.]<br>The court held that the right of publicity survives the death of its owner, and is inheritable and devisable[.]<br>Driving this decision was the court's desire to prevent free riders from benefiting from a celebrity's untimely death[.]<br><br>p. 15, ¶ 42 | The Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc., 250 Ga. 135 (1982)<br>• Plaintiff sought an injunction prohibiting defendant from selling small sculptures of Martin Luther King, Jr. without its permission<br>• Defendant argued that King's right of publicity ended at his death<br>• The court held that the right of publicity survives the death of its owner, and is inheritable and devisable<br>• Driving this decision was the court's desire to prevent free riders from benefiting from a celebrity's untimely death<br><br>http://www.docstoc.com/docs/75989121/The-Right-of-Publicity, at slide 24 |
| [In] *White v. Samsung Electronics America, Inc.*, | White v. Samsung Electronics America, Inc., |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| 971 F.2d 1395 (9th Cir. 1992)[,]Samsung used a robot dressed in a blond wig, evening gown, and jewelry posed in front of a game board similar to that of "Wheel of Fortune"[.]White sued under state common and statutory right of publicity and the Lanham Act[.]The court found for White, holding that Samsung had no right to invoke White's identity in the public's minds without her permission[.]<br><br>p. 15, ¶ 44 | 971 F.2d 1395 (9th Cir. 1992)<br>• Samsung used a robot dressed in a blond wig, evening gown, and jewelry posed in front of a game board similar to that of "Wheel of Fortune"<br>• White sued under state common and statutory right of publicity and the Lanham Act<br>• The court found for White, holding that Samsung had no right to *invoke White's identity in the public's minds* without her permission<br><br>www.acc.com/chapters/socal/upload/Panel-4-IP-final.ppt, at slide 51 |
| New York led the way with the 1903 enactment of New York Civil Right Law sections 50 and 51. This statute prohibits the use of the name, portrait, or picture of any living person without prior consent for "advertising purposes" or "for the purposes of trade."<br><br>pp. 15-16, ¶ 45 | New York led the way with the 1903 enactment of New York Civil Right Law sections 50 and 51. This statute prohibits the use of the name, portrait, or picture of any living person without prior consent for "advertising purposes" or "for the purposes of trade."<br><br>http://www.markroesler.com/legal/rights.html |
| In *Hoepker v. Kruger* [200 F. Supp. 2d 340 (S.D.N.Y. 2002)],8 a federal court in New York was called upon to decide whether a photograph of the plaintiff, cropped and used as part of a collage, violated her rights under the New York right of publicity statute. The court first held that a collage, like a drawing or painting, was a form of art entitled to full First Amendment protection. The court then acknowledged that under California's Saderup test, the collage was transformative enough to be afforded First Amendment protection. However, New York court refused to adopt the Saderup test, stating that courts "should not be asked to draw arbitrary lines between what may be art and what may [not be]." 9 *Id.* at 352<br><br>p. 16, ¶ 46 | In *Hoepker v. Kruger*,8 a federal court in New York was called upon to decide whether a photograph of the plaintiff, cropped and used as part of a collage, violated her rights under the New York right of publicity statute. The court first held that a collage, like a drawing or painting, was a form of art entitled to full First Amendment protection. The court then acknowledged that under California's *Saderup* test, the collage was transformative enough to be afforded First Amendment protection. However, New York court refused to adopt the *Saderup* test, stating that courts "should not be asked to draw arbitrary lines between what may be art and what may [not be]."9<br><br>http://library.findlaw.com/2003/Dec/1/133182.html, 2002 article |
| Instead, the court offered a slightly different test, requiring a determination of whether the collage had primarily a 'public interest' aspect or a | Instead, the court offered a slightly different test, requiring a determination of whether the collage had primarily a 'public interest' aspect or a |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| 'commercial' aspect. Presumably, this means that if the importance of the collage can be found primarily in its social usefulness as a work of art, it will receive First Amendment protection. Conversely, if its primary value lies in generating sales through the popularity of the depicted celebrity, the artist may be liable for a violation of the right of publicity statute. In spite of their different emphases, both the New York and Saderup tests contain the same essential, and difficult, element: they grant or deny First Amendment protection based upon a court's determination of the artistic nature of the work.<br><br>pp. 16-17, ¶ 47 | 'commercial' aspect. Presumably, this means that if the importance of the collage can be found primarily in its social usefulness as a work of art, it will receive First Amendment protection. Conversely, if its primary value lies in generating sales through the popularity of the depicted celebrity, the artist may be liable for a violation of the right of publicity statute. In spite of their different emphases, both the New York and *Saderup* tests contain the same essential, and difficult, element: they grant or deny First Amendment protection based upon a court's determination of the artistic nature of the work. http://library.findlaw.com/2003/Dec/1/133182.html, 2002 article |
| In Grant v. Esquire, Inc., 367 F. Supp. 876 (S.D.N.Y. 1973) for example, the court found that the mere use of a celebrity's identity could cause embarrassment for which mental distress damages would be available. [skipped sentence] ~~Like Waits,~~ Grant had taken a public position against reaping commercial profits from the publicity value of his identity. Id. ~~at~~ 880.<br><br><br><br><br><br><br>p. 17, ¶ 48 | In *Grant v. Esquire, Inc.*, 367 F. Supp. 876 (S.D.N.Y. 1973), for example, the court found that the mere use of a celebrity's identity could cause embarrassment for which mental distress damages would be available. The case involved a suit by Cary Grant against *Esquire* magazine for publishing a photograph in which Grant's head was superimposed on a clothing model's torso. Like Waits, Grant had taken a public position against reaping commercial profits from the publicity value of his identity. Id. at 880.<br><br>*Waits v. Frito-Lay*, 978 F.2d 1093, 1103 (9th Cir. 1992). |
| Without ever seeking, much less obtaining, [Woody] Allen's permission or consent, American Apparel disseminated billboard and Internet advertisements containing Mr. Allen's image and prominently displayed said images on billboards in the Cities of New York and Los Angeles, California, as well as on American Apparel's Internet website. Allen sued American Apparel in the Southern District of New York for violation of his right of publicity under New York's Civil Rights Law § 51 and § 43(a) of 15 U.S.C. § 1125(a), the Lanham Act. | Without ever seeking, much less obtaining, Allen's permission or consent, American Apparel disseminated billboard and Internet advertisements containing Mr. Allen's image and prominently displayed said images on billboards in the Cities of New York and Los Angeles, California, as well as on American Apparel's Internet website.<br><br>Allen sued American Apparel in the Southern District of New York for violation of his right of publicity under New York's Civil Rights Law § 51 and § 43(a) of 15 U.S.C. § 1125(a), the Lanham Act. |

| PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | ONLINE SOURCE |
|---|---|
| p. 17, ¶ 49 | www.loeb.com/.../Right%20of%20Publicity%20Webinar.pdf, at slide 18, posted April 1, 2010 |
| *Carson*, 698 F.2d at 835. It is not important how the defendant has appropriated the plaintiff's identity, but whether the defendant has done so. Motschenbacher, Midler, and Carson teach the impossibility of treating the right of publicity as guarding only against a laundry list of specific means of appropriating identity. A rule, which says that the right of publicity can be infringed only through the use of nine different methods of appropriating identity merely, challenges the clever advertising strategist to come up with the tenth.Indeed, if we treated the means of appropriation as dispositive in our analysis of the right of publicity, we would not only weaken the right but effectively eviscerate it. The right would fail to protect those plaintiffs most in need of its protection.  Advertisers use celebrities to promote their products. The more popular the celebrity, the greater the number of people who recognize her, and the greater the visibility for the product. The identities of the most popular celebrities are not only the most attractive for advertisers, but also the easiest to evoke without resorting to obvious means such as name, likeness, or voice. | *Carson*, 698 F.2d at 835. It is not important *how* the defendant has appropriated the plaintiff's identity, but whether the defendant has done so. *Motschenbacher*, *Midler*, and *Carson* teach the impossibility of treating the right of publicity as guarding only against a laundry list of specific means of appropriating identity. A rule which says that the right of publicity can be infringed only through the use of nine different methods of appropriating identity merely challenges the clever advertising strategist to come up with the tenth.<br><br>Indeed, if we treated the means of appropriation as dispositive in our analysis of the right of publicity, we would not only weaken the right but effectively eviscerate it. The right would fail to protect those plaintiffs most in need of its protection.<br>Advertisers use celebrities to promote their products. The more popular the celebrity, the greater the number of people who recognize her, and the greater the visibility for the product. The identities of the most popular celebrities are not only the most attractive for advertisers, but also the easiest to evoke without resorting to obvious means such as name, likeness, or voice.<br><br>*White v. Samsung Electronics Am.*, 971 F.2d |
| pp. 19-20, ¶ 57 | 1395, 1398-1399 (9th Cir. 1992). |